**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MELVYN KLEIN, Derivatively on Behalf of ONESPAN INC., <br><br> Plaintiff, <br><br> v. <br><br> MARC D. BORODITSKY, MICHAEL P. CULLINANE, JOHN N. FOX, JR., NAUREEN HASSAN, JEAN K. HOLLEY, T. KENDALL "KEN" HUNT, MARIANNE JOHNSON, MATTHEW MOOG, MARC ZENNER, SCOTT M. CLEMENTS, AND MARK S. HOYT, <br><br> Defendants, <br><br> and, <br><br> ONESPAN INC., <br><br> Nominal Defendant. | Case No.: |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant OneSpan, Inc. ("OneSpan" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by OneSpan with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties and unjust enrichment that occurred from May 9, 2018 through the present (the "Relevant Period") and which caused substantial harm to the Company.

2.      The Company was founded in 1991 and is headquartered in Chicago, Illinois. The Company was formerly known as VASCO Data Security International, Inc. and changed its name to OneSpan Inc. in May 2018.

3.      The Company, together with its subsidiaries, designs, develops, and markets digital solutions for identity, security, and business productivity worldwide.

4.      Throughout the Relevant Period, materially false and misleading statements were made regarding the Company's business, operational and compliance policies.  Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On August 4, 2020, the Company postponed its second quarter 2020 earnings release and conference call by one week, attributing the delay to prior-period revenue recognition problems relating to certain software license contracts spread out over the quarters from the first quarter of 2018 to the first quarter of 2020.  The Company further stated that "[t]he net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue."

6.      On this news, the Company's common share price fell $0.46 per share, or 1.40%, to close at $32.50 per share on August 4, 2020.

7.      On August 11, 2020, the Company disclosed that it would not timely file its quarterly report for the quarter ended June 30, 2020 with the SEC; reported that same quarter year-over-year revenues had declined; and withdrew its full year 2020 earnings guidance, which the Company had affirmed one quarter earlier.

8.      On this news, the Company's common share price fell $12.36 per share, or 39.62%, to close at $18.84 per share on August 12, 2020.

## JURISDICTION

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action[1] based on violations of the Exchange Act.

---

[1] As used herein, the Securities Class Action refers to *Almendariz v. OneSpan, Inc., et al.*, No., 1:20-cv-04906 (N.D. Ill.).

3

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

11. Venue is proper in this Court because the Company is located at 121 West Wacker Drive, Suite 2050, Chicago, Illinois 60601.

## THE PARTIES

### Plaintiff

12. **Plaintiff Melvyn Klein** is a current shareholder of the Company common stock. Plaintiff has continuously held the Company common stock at all relevant times. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

13. **Nominal Defendant OneSpan** is a Delaware corporation with principal executive offices located at 121 West Wacker Drive, Suite 2050, Chicago, Illinois 60601.

### Director Defendants

14. **Defendant Marc D. Boroditsky** ("Boroditsky") has been a director since June 2019. Defendant Boroditsky is a member of the Audit Committee, Compensation Committee and Corporate Governance and Nominating Committee.

15. **Defendant Michael P. Cullinane** ("Cullinane") has been a director since April 1998. Defendant Cullinane is the Chairman of the Company's Audit Committee and a member of the Company's Compensation Committee and Corporate Governance and Nominating Committee.

16. **Defendant John N. Fox, Jr.** ("Fox") has been a director since April 2005. Defendant Fox is Chairman of the Board of Directors (the "Board"), Chairman of the Company's

4

Compensation Committee and is a member of the Audit Committee and Corporate Governance and Nominating Committee.

17.    **Defendant Naureen Hassan** ("Hassan") has been a director since March 2020. Defendant Hassan is a member of the Audit Committee, Compensation Committee and Corporate Governance and Nominating Committee.

18.    **Defendant Jean K. Holley** ("Holley") has been a director since August 2006. Defendant Holley is Chair of the Corporate Governance and Nominating Committee and a member of the Audit Committee and Compensation Committee.

19.    **Defendant T. Kendall Hunt** ("Hunt") is the Founder and former Chief Executive Officer ("CEO") and Chairman of the Board. Defendant Hunt served as Chairman of the Board from 1997 until 2018. Defendant Hunt was the Company's CEO from 1997 through 1999 and again from 2002 to 2017. Defendant Hunt owns 6,558,589 shares of Company stock or 16.3% of the outstanding shares.

20.    **Defendant Marianne Johnson** ("Johnson") has been a director since March 2020. Defendant Johnson is a member of the Audit Committee, Compensation Committee and Corporate Governance and Nominating Committee.

21.    **Defendant Matthew Moog** ("Moog") has been a director since December 2012. Defendant Moog is a member of the Audit Committee, Compensation Committee and Corporate Governance and Nominating Committee.

22.    **Defendant Marc Zenner** ("Zenner") has been a director since June 2019. Defendant Zenner is a member of the Audit Committee, Compensation Committee and Corporate Governance and Nominating Committee.

23.     Defendants Boroditsky, Cullinane, Fox, Hassan, Holley, Hunt, Johnson, Moog and Zenner are herein referred to as "Director Defendants."

**Officer Defendants**

24.     *Defendant Scott Clements* ("Clements") has served as the Company's CEO at all relevant times.

25.     *Defendant Mark S. Hoyt* ("Hoyt") has served as the Company's Chief Financial Officer ("CFO") at all relevant times.

26.     The Director Defendants and Defendants Clements and Hoyt are collectively referred to herein as "Defendants".

## CODE OF BUSINESS CONDUCT AND ETHICS

27.     As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

28.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants caused the Company to conceal the true facts as alleged herein.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

29.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information

concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

30.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by failing to maintain adequate internal controls and by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Defendants were a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

31.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

32.     At all times relevant hereto, each of the Defendants was the agent of each of the other and of the Company and was at all times acting within the course and scope of such agency.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

33.     The Board has constituted and established an Audit Committee with authority, responsibility, and specific duties as described in this Audit Committee Charter (the "Charter").  The Audit Committee shall review and reassess the adequacy of the Charter annually and recommend any proposed changes to the Board for approval.  The Audit Committee Charter states in relevant part:

**Authorities and Responsibilities of the Audit Committee**

**To fulfill its responsibilities and duties the Committee shall:**

**A.      Review of Financial Reports/Releases**

1.      *Review and discuss with the Company's management and its registered public accounting firm each of the Company's annual audited and quarterly financial statements, including, (a) in the case of the annual audited financial statements, the report of the public accounting firm, (b) in the case of the quarterly financial statements, the results of the public accounting firm's review thereof, and (c) in all cases, related financial disclosures (e.g., Managements Discussion and Analysis of Financial Condition and Results of Operations) that are included in reports to be filed with the SEC, prior to such reports being filed. Discussions with management and the Company's registered public accounting firm shall include all items that are required to be communicated by the registered public accounting firm under the then applicable Statements on Auditing Standards,* including but not limited to:

- Significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements;

- Restrictions on the scope of the registered public accounting firm's activities;

- Issues related to access to information requested by the registered public accounting firm;

- All critical accounting policies and practices used in the preparation of the reports;

- Alternative treatments of financial information within generally accepted accounting principles that have been discussed by management and the registered public accounting firm, ramifications of the use of such alternative treatments, and the treatment preferred by the registered public accounting firm;

- The registered public accounting firm's judgments about the quality and appropriateness of the Company's accounting principles;

- Reasonableness of significant estimates made by management;

- Significant changes in accounting principles, practices, judgments or estimates;

- • Clarity and adequacy of disclosures;

- • Any potentially illegal acts or instances of fraud noted during the review or audit; and

- • Significant disagreements between management and the registered public accounting firm.

2. Determine whether it will recommend to the Board that the Company's annual audited financial statements be included in the Company's Annual Report on Form 10-K.

3. Prepare a report in accordance with the SEC's rules and regulations for inclusion in the Company's annual proxy statement.

4. Review and discuss with the Company's management and its registered public accounting firm the Company's quarterly and annual earnings press releases, including the use of any "pro forma," "adjusted" or other non-GAAP information, prior to the issuance of the release to the public.

5. Review and discuss with the Company's management the release of any financial or other related data that may provide guidance to analysts, rating agencies and others. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made). [Emphasis added].

## THE FALSE AND MISLEADING STATEMENTS

34. On May 8, 2018, the Company issued a press release reporting its financial and operating results for the first quarter of 2018 (the "1Q18 Press Release"). The 1Q18 Press Release reported that "[r]evenue for the first quarter of 2018 increased 8% to $45.4 million from $42.0 million in the first quarter of 2017," and that software licenses revenue was $16.003 million for the quarter.

35. The 1Q18 Press Release also quoted Defendant Clements who stated that the Company "reported record non-hardware revenue in the first quarter with strong contributions from software licenses and subscriptions"; that this "success was underscored by the doubling of [the Company's] mobile security software and an increase of nearly 50% in [the Company's] e-signature

solutions"; and that "[s]trong software and services revenue combined with expected Q1 declines in hardware revenue contributed to a higher gross profit margin."

36.     On May 9, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q affirmed the Company's revenue results reported in the 1Q18 Press Release, including the figure reported for software licenses revenue.

37.     With respect to how the Company accounts for license revenue, the 1Q18 10-Q represented that "[r]evenue from the sale of software licensing is recorded upon the latter of when the customer receives the ability to access the software or when they are legally allowed to use the software"; that "[n]o significant obligations or contingencies exist with regard to delivery, customer acceptance or rights of return at the time revenue is recognized"; that "[c]ustomer payments normally correspond with delivery for perpetual licenses"; that, "[f]or term licenses, payments are either on installment or in advance"; that the Company "ha[s] determined that, consistent with [their] conclusion under prior revenue recognition rules, [they] act as the principal with respect to the satisfaction of the related performance obligation and record the corresponding revenue on a gross basis from these transactions"; and that "[t]he fees paid to the third parties are recognized as a component of cost of sales when the revenue is recognized."

38.     With respect to how the Company recognized revenue following the Company's adoption of Accounting Standards Update No. 2014-09 "Revenue from Contracts with Customers" (FASB Accounting Standards Codification (ASC) Topic 606, or "Topic 606"), the 1Q18 10-Q stated that the Company "determine[s] revenue recognition through . . . [i]dentification of the contract, or contracts, with a customer," "[i]dentification of the performance obligations in the contract," "[d]etermination of the transaction price," "[a]llocation of the transaction price to the performance

obligations in the contract," and "[r]ecognition of revenue when, or as, [they] satisfy a performance obligation"; that "[r]evenues are recognized when control of the promised goods or services is transferred to [the Company's] customers, in an amount that reflects the consideration [the Company] expect[s] to be entitled to in exchange for those products or services, which excludes any sales incentives and amounts collected on behalf of third parties"; that "[t]axes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction, that are collected by the Company from a customer, are excluded from revenue"; and that "[s]hipping and handling costs associated with outbound freight after control over a product has transferred to a customer are accounted for as a fulfillment cost and are in [sic] included in cost of revenues."

39.     With respect to the Company's disclosure controls and procedures, the 1Q18 10-Q represented that the Company's "management, with the participation of [the Company's] Chief Executive Officer and Chief Financial Officer . . . conducted an evaluation of the effectiveness of [the Company's] disclosure controls and procedures . . . as of the end of the period covered by this Quarterly Report on Form 10-Q"; that "[d]isclosure controls and procedures include, without limitation, controls and procedures designed to ensure . . . the information required to be disclosed by [the Company] in [its] reports that [the Company] file[s] or submit[s] under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the [SEC]'s rules and forms," as well as that "information required to be disclosed by [the Company] in [their] reports that [they] file or submit under the Exchange Act is accumulated and communicated to [the Company's] management, including [the] principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required

disclosure"; and that the Company's "disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives."

40.     With respect to changes in internal controls, if any, that occurred during the quarter covered by the 1Q18 10-Q, the 1Q18 10-Q stated that, "[e]ffective January 1, 2018, [the Company] adopted Accounting Standards Codification 606 ('ASC 606'), 'Revenue from Contracts with Customers'"; that "[c]hanges were made to the relevant business processes and the related control activities in order to monitor and maintain appropriate controls over financial reporting"; that "[t]hese included the development of new entity-wide policies based on the five step model provided in the revenue recognition standard, new training, ongoing contract review requirements, and gathering of information provided for disclosures"; and that, "[o]ther than the changes noted above, there were no changes in [the Company's] internal control over financial reporting during the quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, [the Company's] internal control over financial reporting."

41.     Further, the 1Q18 10-Q contained generic, boilerplate representations regarding the risks inherent in "all control systems." The 1Q18 10-Q represented that the Company's "management, including [its] Chief Executive Officer and Chief Financial Officer, do not expect that [the Company's] disclosure controls and procedures or internal control over financial reporting will prevent all error and all fraud"; that "[a] control system, no matter how well designed and implemented, can provide only reasonable, not absolute, assurance that the control system's objectives will be met"; that "the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs"; that, "[b]ecause of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company are

12

detected"; that "[t]he inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple errors or mistakes"; that "[c]ontrols can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls"; that "[t]he design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions"; that "[p]rojections of any evaluation of controls' effectiveness to future periods are subject to risks"; that, "[o]ver time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures"; and that, "[b]ecause of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and may not be detected."  The foregoing risk warnings were generic, catch-all provisions that were not tailored to the Company's actual known risks regarding the Company's calculation of revenue for contracts with customers involving software licenses.

42.     On July 26, 2018, the Company issued a press release reporting its financial and operating results for the second quarter of 2018 (the "2Q18 Press Release").  The 2Q18 Press Release stated that "[r]evenue for the second quarter of 2018 was $49.6 million, an increase of 8% from $45.7 million for the second quarter of 2017"; that "[r]evenue for the first six months of 2018 was $95.0 million, an increase of 8% from $87.7 million for the first six months of 2017"; and that software licenses revenue was $10.410 million and $26.413 million for the three and six months ended June 30, 2018, respectively.

43.     The 2Q18 Press Release also quoted Defendant Clements who stated that "[t]he second quarter marked a significant turning point for OneSpan™, with a global rebrand, the launch of [the Company's] Trusted Identity platform and the acquisition of identity verification innovator,

Dealflo," each of which that "was executed in support of [the Company's] software focused growth strategy"; and that, "[d]uring the quarter, [the Company] benefitted from strong growth in [*inter alia*] . . . increased software licenses."

44.     On August 3, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q affirmed the Company's revenue results reported in the 2Q18 Press Release, including the figures reported for software licenses revenue. Further, the 2Q18 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶41.

45.     The 2Q18 10-Q also represented that "[t]here were no changes in [the Company's] internal control over financial reporting during the three months ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, [the Company's] internal control over financial reporting."

46.     On October 30, 2018, the Company issued a press release reporting its financial and operating results for the third quarter of 2018 (the "3Q18 Press Release"). the 3Q18 Press Release reported that "[r]evenue for the third quarter of 2018 was $52.5 million, an increase of 3% from $51.1 million for the third quarter of 2017"; that "[r]evenue for the first nine months of 2018 was $147.5 million, an increase of 6% from $138.8 million for the first nine months of 2017"; and that software licenses revenue was $9.826 million and $36.239 million for the three and nine months ended September 30, 2018, respectively.

47.     On November 2, 2018, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q affirmed the Company's revenue results reported in the

3Q18 Press Release, including the figures reported for software licenses revenue. Further, the 3Q18 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶ 41.

48.     On February 19, 2019, the Company issued a press release reporting its financial and operating results for the fourth quarter and full year of 2018 (the "4Q/FY18 Press Release"). 4Q/FY18 Press Release reported that "[r]evenue for the fourth quarter of 2018 was $64.8 million, an increase of 19% from $54.5 million for the fourth quarter of 2017"; that "[r]evenue for the full year 2018 was $212.3 million, an increase of 10% from $193.3 million for the full year 2017"; and that software licenses revenue was $11.178 million and $47.417 million for the three and twelve months ended December 31, 2018, respectively.

49.     The 4Q/FY18 Press Release also quoted Defendant Clements who stated that the Company "had a very strong fourth quarter with revenue up 19% on solid contributions across our portfolio of [*inter alia*] software," and that "mobile security software licenses revenue grew more than 50%."

50.     On March 15, 2019, the Company filed an annual report on Form 10-K with the SEC, reporting its financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K affirmed the Company's revenue results reported in the 4Q/FY18 Press Release, including the figures reported for software licenses revenue. Further, the 2018 10-K contained substantively the same statements as referenced in ¶¶ 37-39, and ¶ 41. Defendants Clements, Hoyt, Fox, Cullinane, Holley, Hunt and Moog signed the 2018 10-K.

51.     While acknowledging that the Company's "disclosure controls and procedures were not effective as of December 31, 2018," because of a "material weakness in [the Company's] internal control over financial reporting," and that "the Company's internal control over financial reporting was not effective . . . as of December 31, 2018, due to the material weakness," the 2018

10-K simultaneously downplayed the impact of this deficiency by representing that "[t]hese control deficiencies led to immaterial misstatements . . . some of which were corrected by the Company prior to the issuance of the December 31, 2018 consolidated financial statements."

52. The 2018 10-K also downplayed the future impact or occurrence of future deficiencies by touting various remedial measures the Company had implemented to cure these deficiencies, stating that, "[d]uring the three months ended December 31, 2018, the Company initiated its remediation plan related to the material weakness that was identified in 2018"; that the Company "[has] hired, and plan[s] to continue hiring, additional accounting personnel with the requisite technical knowledge with respect to revenue recognition and internal control over financial reporting"; that the Company "will consider use of third party resources to ensure [they] have a sufficient complement of resources"; that the Company "[w]ill conduct an expanded training program for [their] new and existing personnel on internal control over financial reporting and accounting for revenue recognition"; that "[m]anagement will complete the implementation of a new comprehensive worldwide enterprise resource planning (ERP) system, effective January 1, 2019," which "will improve and enhance the Company's processes by increasing the level of automation, which is expected improve the efficiency and effectiveness of certain financial reporting and business processes"; that the Company "[d]esign[s], implement[s] and operate[s] effective process-level controls throughout each of the processes in which there were ineffectively designed and implemented controls during 2018"; that the Company "[d]esign[s] and implement[s] an effective continuous risk assessment processes to monitor changes that could significantly impact [their] internal control over financial reporting"; and that the Company "expect[s] remediation of the material weakness will be completed in fiscal year 2019."

53.     On May 7, 2019, the Company issued a press release announcing its financial and operating results for the first quarter of 2019 (the "1Q19 Press Release").  1Q19 Press Release reported that "[r]evenue for the first quarter of 2019 was $47.6 million, an increase of 5% from $45.4 million for the first quarter of 2018," and that software licenses revenue was $7.571 million for the quarter.

54.     That same day, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q").  The 1Q19 10-Q affirmed the Company's revenue results reported in the 1Q19 Press Release, including the figure reported for software licenses revenue.  Further, the 1Q19 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶41.

55.     While acknowledging that a material weakness still existed in the Company's disclosure controls and procedures and internal control over financial reporting, the 1Q19 10-Q continued to downplay this deficiency by touting the Company's remediation plan as described in the 2018 10-K, and by assuring investors that, "[a]dditionally, the Company concluded the implementation of a new global enterprise resource planning ('ERP') system during the three months ended March 31, 2019," which "has replaced [OneSpan's] existing operating and financial systems and is designed to accurately maintain the Company's financial records, enhance operational functionality, and provide timely information to the Company's management team related to the operation of the business."

56.     The 1Q19 10-Q further assured investors that the Company "also implemented internal controls to ensure [they] adequately evaluated [their] contracts and properly assessed the impact of ASC 842 to facilitate the adoption on January 1, 2019, as well as [the Company's] on-going accounting."

57.     On July 25, 2019, the Company issued a press release reporting its financial and operating results for the second quarter of 2019 (the "2Q19 Press Release").   2Q19 Press Release reported that "[r]evenue for the second quarter of 2019 was $56.2 million, an  increase of 13% from $49.6 million for the second quarter of 2018"; that "[r]evenue for the first six months of 2019 was $103.8 million, an increase of 9% from $95.0 million for the first six months of 2018"; and that software licenses revenue was $11.078 million and $18.649 million for the three and six months ended June 30, 2019, respectively.

58.     On July 31, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q").  The 2Q19 10-Q affirmed the Company's revenue results reported in the 2Q19 Press Release, including the figures reported for software licenses revenue.  Further, the 2Q19 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶ 41.

59.     Further, with respect to relevant accounting measures, the 2Q19 10-Q represented that, "[e]xcept for the accounting policies related to lease accounting . . . there have been no changes to significant accounting policies described in [2018 10-K] . . . that have had a material impact on the Company's condensed consolidated financial statements and related notes."

60.     On October 29, 2019, the Company issued a press release reporting its financial and operating results for the third quarter of 2019 (the "3Q19 Press Release").  The 3Q19 Press Release reported that "[r]evenue for the third quarter of 2019 was $79.7 million, an increase of 52% from $52.5 million for the third quarter of 2018"; that "[r]evenue for the first nine months of 2019 was $183.6 million, an increase of 24% from $147.5 million for the first nine months of 2018"; and that software licenses revenue was $19.154 million and $37.803 million for the three and nine months ended September 30, 2019, respectively.

61.     On October 30, 2019, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q affirmed the Company's revenue results reported in the 3Q19 Press Release, including the figures reported for software licenses revenue. Further, the 3Q19 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶ 41.

62.     On March 3, 2020, the Company issued a press release reporting its financial and operating results for the fourth quarter and full year of 2019 (the "4Q/FY19 Press Release").  The 4Q/F19 Press Release reported that "[r]evenue for the fourth quarter of 2019 was $71.0 million, an increase of 10% from $64.8 million for the fourth quarter of 2018"; that "[r]evenue for the full year 2019 was $254.6 million, an increase of 20% from $212.3 million for the full year 2018"; and that software licenses revenue was $19.365 million and $57.168 million for the three and twelve months ended December 31, 2019, respectively.

63.     The 4Q/FY19 Press Release also quoted Defendant Clements who stated that the Company's "transformation continues to yield positive results as [the Company] enjoyed an impressive fourth quarter with [inter alia] software license revenue up 73% . . . contributing to total software revenue growth of 63%"; that "[t]otal revenue increased 20% to $255 million, [the Company's] highest year ever"; and that "total software revenue grew 26%."

64.     On March 16, 2020, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for quarter and year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K affirmed the Company's full year revenue results reported in the 4Q/FY19 Press Release, including the full year figure reported for software licenses revenue. Further, the 2019 10-K contained substantively the same statements as referenced in ¶¶ 37-39, and ¶

41. Defendants Clements, Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner and Boroditsky signed the 2019 10-K.

65. The 2019 10-K also represented that the Company had remediated the material weakness in the Company's internal control over financial reporting identified in the 2018 10-K. In its discussion of changes of internal control over financial reporting, the 2019 10-K stated that "[d]uring the three months ended December 31, 2019, the Company finalized its remediation plan related to the material weakness that was disclosed in [the 2018 10-K]"; that the Company "[is] satisfied that the material weakness in internal control over financial reporting identified as of December 31, 2018, has been remediated"; that the Company "[h]ired additional accounting personnel with the requisite technical knowledge with respect to revenue recognition and internal control over financial reporting and have used third party resources to ensure we have a sufficient complement of resources"; that the Company "[c]onducted an expanded training program for [their] new and existing personnel on internal control over financial reporting, accounting for revenue recognition, and other relevant accounting topics"; that the Company "[c]oncluded the implementation of a new global enterprise resource planning ('ERP') system," which "replaced [the Company's] previous operating and financial systems and is designed to accurately maintain the Company's financial records, enhance operational functionality, and provide timely information to the Company's management team related to the operation of the business"; that the Company "[d]esigned, implemented and operated effective process-level controls throughout each of the processes in which there were ineffectively designed and implemented controls as of December 31, 2018"; that the Company "[d]esigned and implemented an effective continuous risk assessment processes to monitor changes that could significantly impact [the Company's] internal control over financial reporting"; and that, "[e]xcept for the changes in connection with [the Company's]

finalization of the remediation plan discussed above, there have been no other changes in [the Company's] internal control over financial reporting . . . that occurred during the fourth quarter of 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

66.     The 2019 10-K also represented that "management have concluded that the Company's disclosure controls and procedures are effective as of December 31, 2019," and that "[m]anagement's evaluation of [the Company's] internal control over financial reporting determined that the Company's internal control over financial reporting was effective . . . as of December 31, 2019."

67.     On May 5, 2020, the Company issued a press release reporting its financial and operating results for the first quarter of 2020 (the "1Q20 Press Release"). The 1Q20 Press Release reported that "[r]evenue for the first quarter of 2020 was $56.5 million, an increase of 19% from $47.6 million for the first quarter of 2019," and that software licenses revenue was $18.522 million for the quarter. The 1Q20 Press Release also provided full year 2020 financial guidance of "[r]evenue in the range of $255 million to $265 million" and "[a]djusted EBITDA in the range of $24 million to $28 million."

68.     On May 7, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q affirmed the Company's revenue results reported in the 1Q20 Press Release, including the figure reported for software licenses revenue. Further, the 1Q20 10-Q contained substantively the same statements as referenced in ¶¶ 37-39, and ¶ 41.

69.     In addition, with respect to relevant accounting measures, the 1Q20 10-Q represented that "[e]xcept for certain changes which resulted from the adoption of ASU 2016-13, there have

been no changes to the significant accounting policies described in the [2019 10-K] that have had a material impact on the Company's condensed consolidated financial statements and related notes."

70.     The statements referenced in ¶¶ 34-69 were materially false and misleading because the statements failed to disclose material adverse facts about the Company's business, operations and compliance policies.  The statements also failed to disclose that: (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

71.     On August 4, 2020, the Company issued a press release reporting that it was postponing its second quarter 2020 earnings release and conference call by one week, attributing the delay to prior period revenue recognition problems relating to certain software license contracts spread out over the quarters from the first quarter of 2018 to the first quarter of 2020.  The press release stated:

> OneSpan . . . today announced it has changed the date it plans to release the company's second quarter 2020 earnings release and hold its earnings conference call, previously scheduled for August 4, 2020.
>
> During the second quarter of 2020, OneSpan identified immaterial errors that originated in prior periods. The errors relate to certain contracts with customers

involving software licenses. The net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue. The current estimated cumulative overstatements of revenue through March 31, 2020 total between $2 million and $2.5 million and were spread out over the quarters from Q1 2018 to Q1 2020, representing less than 0.5% of total revenue in that time frame. The Company currently believes these errors to be immaterial. To correct these immaterial errors related to prior periods, the Company expects to adjust the prior period revenue and related amounts in its Form 10-Q for Q2 2020 and future filings with the SEC. The Company is evaluating the impact on its prior determination that internal control over financial reporting was effective as of December 31, 2019.

OneSpan plans to report its second quarter 2020 financial results on Tuesday, August 11, 2020, after the market close. The Company will host a conference call to discuss its second quarter 2020 financial results on the same day at 4:30 p.m. Eastern Time.

72.     On this news, the Company's common share price fell $0.46 per share, or 1.40%, to close at $32.50 per share on August 4, 2020.

73.     On August 11, 2020, the Company issued a press release reporting its financial and operating results for the second quarter of 2020.   That press release reported that same quarter year-over-year revenues had declined, and that the Company was withdrawing its full year 2020 earnings guidance, which the Company had affirmed one quarter earlier.   The press release stated:

**Second Quarter 2020 Financial Highlights[]**

Revenue for the second quarter of 2020 was $55.0 million, a decrease of 2% from $56.2 million for the second quarter of 2019. Revenue for the first six months of 2020 was $111.3 million, an increase of 8% from $103.3 million for the first six months of 2019.

* * *

**Full Year 2020 Outlook**

Given the increased uncertainty about the impact of the pandemic on the global economy and our customers, the Company believes it prudent to withdraw its previously issued full-year guidance. Management will provide additional commentary during its second quarter earnings conference call.

74.     That same day, the Company filed a notification of inability to timely file Form 10-Q on Form NT 10-Q with the SEC, disclosing that the Company could not timely file its quarterly report for the quarter ended June 30, 2020, by the original due date of August 10, 2020, because of the "immaterial errors" identified in the Company's August 4, 2020 press release.   The Form NT 10-Q stated:

> OneSpan . . . has determined that it is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (the "Form 10-Q") by August 10, 2020, the original due date for such filing, without unreasonable effort or expense because it requires additional time to complete its financial statements. As previously announced, the Company identified immaterial errors related to certain contracts with customers involving term-based software licenses. The net contract assets that originated from a portion of these contracts in prior periods were not properly accounted for in subsequent periods, which caused overstatements of revenue. The cumulative overstatements of revenue total $2.2 million over the period from the first quarter in the year ended December 31, 2018 to the quarter ended March 31, 2020, representing less than 0.5% of total revenue in that time frame.
>
> The Company believes these errors to be immaterial. To correct these immaterial errors related to prior periods, the Company expects to adjust the prior period revenue and related amounts in its Form 10-Q and future filings with the SEC.

75.     Following the issuance of the Company's August 11, 2020 press release and the filing of the Form NT 10-Q, the Company's common share price fell $12.36 per share, or 39.62%, to close at $18.84 per share on August 12, 2020.

## DAMAGES TO THE COMPANY

76.     As a direct and proximate result of the above alleged conduct, the Company will lose and expend many millions of dollars.

77.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Clements and Hoyt, and amounts paid to outside lawyers, accountants, and investigators in connection therewith, and losses of revenues caused by customers' loss of trust in the Company's business and products.

78.     Such expenditures include, but are not limited to, compensation and benefits paid to the Director Defendants who breached their fiduciary duties to the Company.

79.     As a direct and proximate result of the above alleged conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

109.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

110.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

111.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

112.     The Company Board is currently comprised of nine (9) members – Defendants Boroditsky, Cullinane, Fox, Hassan, Holley, Hunt, Johnson, Moog and Zenner. Thus, Plaintiff is

required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

113.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

114.    The Director Defendants (or, at the very least, a majority of them) cannot exercise independent objective judgment about whether to bring or vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

115.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

116.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Hunt**

117.     Defendant Hunt's ownership of 16.3% of the Company's outstanding and issued common stock, in conjunction with his being both the CEO and Chairman, evidences that he is and has been the Company's controlling shareholder.  Moreover, his large interest in Company stock – worth reveals his interest in maintaining the Company stock price as high as possible.

**Defendants Clements, Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner and Boroditsky**

118.     Defendants Hoyt, Fox, Cullinane, Holley, Hunt and Moog each signed the false and misleading 2018 Form 10-K.  Defendants Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner and Boroditsky each signed the false and misleading 2019 Form 10-K.   The 2018 and 2019 Form 10-Ks were false and misleading because (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.  Thus, Defendants Hoyt, Fox, Cullinane, Holley, Hunt, Moog, Zenner and Boroditsky each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

119.     Demand is excused as to all of the Directors Fox, Cullinane, Holley, Hunt, Moog, Zenner and Boroditsky because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

**Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner**

120.     Demand is excused because Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner face a substantial likelihood of liability for their misconduct.

121.     During the Relevant Period, Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

122.     As members of the Audit Committee, Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner knew, or should have known, that during as the Relevant Period (1) the Company had inadequate disclosure controls and procedures, and internal control over financial reporting; (2) as a result, the Company overstated its revenue relating to certain contracts with customers involving software licenses in its financial statements spread out over the quarters from the first quarter of 2018 to the first quarter of 2020; (3) as a result, it was foreseeably likely that the Company would eventually have to delay one or more scheduled earnings releases, conference calls, and/or financial filings with the SEC; (4) the Company downplayed the negative impacts of

errors in its financial statements; (5) all the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Company's financial results and reputation; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

123.     Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Boroditsky, Cullinane, Fox, Hassan, Johnson, Moog and Zenner face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against The Director Defendants for Breach Of Fiduciary Duties)

124.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

125.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

126.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

127.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported

financials and internal controls. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128. As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

129. As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### SECOND CAUSE OF ACTION

### (Against Director Defendants for Abuse Of Control)

130. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131. The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

132. As a direct and proximate result of the Director Defendants' abuse of control, the Company has sustained significant damages. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

133. Plaintiff, on behalf of the Company, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

#### (Against Director Defendants for Waste Of Corporate Assets)

134.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Director Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend and investigate unlawful actions, and to lose business from customers who no longer trust the Company and its products.

136.     As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

137.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

#### (Against Defendants Clements and Hoyt for Contribution Under Sections 10(b) and 21D of the Exchange Act)

138.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.     The Company, along with Defendants Clements and Hoyt  are named as defendants in the securities class action entitled *Almendariz v. OneSpan, Inc., et al.*, Case: 1:20-cv-04906 (N.D. Ill.) ("Securities Class Action"), which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Actions for these

violations of law, the Company's liability will be in whole or in part due to Defendants Clements and Hoyt's willful and/or reckless violations of their obligations as officers of the Company.

140.     Through their positions of control and authority as officers, directors, and controlling shareholder of the Company, Defendants Clements and Hoyt were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

141.     As such, Defendants Clements and Hoyt are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 23, 2020    By:    *s/    Daniel O. Herrera*
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
Jennifer W. Sprengel
Daniel O. Herrera
Kaitlin Naughton
150 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel: (312) 782-4880
Fax: (312) 782-4485
Email: dherrera@caffertyclobes.com
Email: jsprengel@caffertyclobes.com
Email: knaughton@caffertyclobes.com

*Liaison Counsel for Plaintiff*

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

*Counsel for Plaintiff*

## VERIFICATION

I, MELVYN KLEIN, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___23___ day of ___10___ ___23___, 2020.

_____
MELVYN KLEIN